**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**TAKYIA JACKSON**                                                                      **PLAINTIFF**

**v.**                                                                **No. 4:23-cv-00066-MPM-JMV**

**MANAGEMENT & TRAINING**                                                         **DEFENDANT**
**CORPORATION**

<u>**ORDER**</u>

This cause comes before the Court on the Motion for Summary Judgment [32] filed by Defendant Management & Training Corporation ("MTC"). The plaintiff has responded in opposition to the motion [36], and the Court, having considered the memoranda and submissions of the parties, concludes that the defendant's motion should be granted in part and denied in part.

<u>**BACKGROUND**</u>

This is a sexual harassment case arising out of the plaintiff's former employment with MTC as a case manager at East Mississippi Correctional Facility ("EMCF"). The plaintiff alleges that shortly after she was hired in February 2021, she began suffering persistent sexual harassment at the hands of Lieutenant Eligah Lee. Jackson alleges that, among other things, Lee frequently made sexual comments, touched her, and asked plaintiff to join him and his wife in a threesome. Though the plaintiff repeatedly told Lee that his advances made her uncomfortable, his behavior continued. The plaintiff made repeated complaints, both written and verbal, to colleagues and supervisors, but to no avail. She continued to receive unwelcome sexual advances from Lee for months. In November 2021, Jackson "again complained of Lee's sexual harassment, this time to her direct supervisor" and other colleagues. [1] at 3. At some point, the plaintiff was moved to a new unit where, on November 26, 2021, an inmate was murdered. Because Jackson was one of the few employees in the vicinity when the incident occurred, an MDOC investigator contacted her to

1

provide a statement and the plaintiff did so. Later that day, the investigator contacted Jackson again and asked to take photos of her tattoos as part of the investigation. She refused. The EMCF Warden, Donald Jackson ("the Warden"), told the plaintiff that if she did not cooperate with the investigation, MDOC would place her on leave. Jackson still refused. On December 8, 2021, the Warden received the following email from MDOC's Director of Investigations, John Hunt:

> Warden Jackson,
>
> I recently received information from MDOC Investigators pertaining to Case Manager Takyia Jackson. According to their information, investigators observed and identified Ms. Jackson's tattoos as being associated with the STG Vice Lords. I requested they seek assistance from the EMCF STG Coordinator and take photographs of the tattoos for record.
>
> Ms. Jackson has apparently refused to cooperate with investigators' ongoing investigation at EMCF and not allow them to take photos of her tattoos; therefore, it is requested Ms. Jackson no longer be allowed to have contact with any MDOC offender, their records or activities.
>
> I have discussed this situation with Commissioner Cain and he is in agreement that she shall no longer be involved with state inmates in any way.
>
> Thank you,
>
> John Hunt

[32-3] at 1. Thus, Jackson no longer had permission to enter the facility and could not perform her job duties. The next day, the plaintiff was informed by MTC's human resources manager that she was terminated. The formal Notice of Caution issued to Jackson provided an explanation for the decision:

> Takyia Jackson, on December 8, 2021 an email was received from the Criminal Investigations Division (CID) of the Mississippi Department of Corrections (MDOC) stating that you refused to cooperate with an ongoing Investigation at East Mississippi and therefore would no longer be allowed to have contact with any MDOC offender, their records or activities. When asked by Human Resources Manager Keith O'Banion on December 9, 2021 to provide a statement concerning this matter, you failed to do so.

> Ms. Jackson, our customer MDOC has the right to revoke your clearance based upon your failure to cooperate with credible investigative work. The revocation prohibits you from performing essential functions of your position. Due to the revocation of your security clearance and MDOC's contrite request for termination, we are recommending your immediate termination from the MTC – East Mississippi Correctional Facility.

[32-4] at 1. The following month, Jackson filed a charge of discrimination with the EEOC alleging sexual harassment and retaliation. After receiving a dismissal from the EEOC, the plaintiff filed suit against MTC in April 2023. The defendant now seeks summary judgment in its favor.

## LEGAL STANDARDS

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). A fact is "material" if its resolution in favor of one party may affect the outcome of the case. *See Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022) (citing *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). At the summary judgment stage, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). If a moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law, the nonmoving party "must come forward with specific facts showing a genuine factual issue for trial." *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid*

*Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted." *Little*, 37 F.3d at 1076.

## ANALYSIS

The defendant's argument for dismissal is two-fold. First, MTC argues that Jackson's retaliation claim fails because "Jackson's alleged reporting of sexual harassment by [Lee] had nothing to do with her termination" and was solely "because MDOC would not allow her to work in the prison for MTC."[1] [33] at 1. Secondly, the defendant argues that "the harassment [Jackson] claims she experienced falls well short of the level of harassment necessary for her to succeed on her sexual harassment/hostile work environment claim." *Id.*

### A.    Retaliation

Title VII makes it unlawful for "an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation using circumstantial evidence, the plaintiff must show that "(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Saketkoo*, 31 F.4th at 1000.

MTC has expressed doubts as to whether Ms. Jackson lodged complaints of sexual harassment to the appropriate superiors but, for purposes of its summary judgment motion only, does not dispute that the first element is satisfied. Neither does the defendant dispute that the

---

[1] "MDOC concluded, right or wrong, that Jackson . . . had gang tattoos and . . . refused to cooperate with MDOC in an investigation, thereby making her presence in the prison dangerous and warranting the revocation by MDOC of the security clearance she needed to work in the prison for MTC." [33] at 1.

plaintiff's termination qualifies as an adverse employment action.[2] The defendant's argument, therefore, centers on the final prong of her *prima facia* case: the causal connection.

The defendant argues that Ms. Jackson fails to establish the causal connection necessary to establish a *prima facia* case of retaliation because she was only terminated after MDOC revoked her security clearance, making it impossible for her to enter the facility and perform her job. Specifically, the defendant argues that

> [Jackson] cannot prove that any complaints she made . . . had any bearing on MTC's decision to abide by the directive it received from MDOC to revoke [her] security clearance. The alleged harassment by Lee and Jackson's purported reporting of the harassment are completely separate matters from MDOC's conclusion that Jackson had gang ties and had refused to cooperate in MDOC's investigation.

[33] at 7. The plaintiff offers little to rebut this assertion and, instead, spills much ink arguing that it was unreasonable for MDOC to reach such a conclusion, which is immaterial. The plaintiff offers no evidence that MTC (1) initiated or conducted the investigation leading to the loss of her security clearance; (2) had any input over whether she retained her security clearance; or (3) had any alternative but to terminate her after receiving MDOC's directive.[3] Therefore, the plaintiff has failed to establish the requisite causal connection and, thus, her retaliation claim should be dismissed.

---

[2] In her response to the instant motion, Ms. Jackson claims for the first time that she "suffered two adverse employment actions, one being that she was assigned to a more violent unit, and the other for being terminated for violence that occurred in the unit." [37] at 27. The plaintiff does not reference the reassignment anywhere in the complaint (or her deposition), only her termination. When a claim is raised for the first time in response to a motion for summary judgment, it is not properly before the court and may be disregarded. *Cutera v. Bd. of Supervisors of La. St. Univ.*, 429 F.3d 108, 113 (5th Cir. 2005); *Green v. JP Morgan Chase Bank, NA*, 562 F. App'x 238, 240 (5th Cir. 2014). Accordingly, this Court will only address the adverse action claimed in the complaint – Jackson's termination.

[3] Additionally, the plaintiff's response belies the argument that her termination was causally related to her sexual harassment complaints. Jackson's response repeatedly argues that MDOC and MTC needed someone to blame for the stabbing and used the plaintiff's tattoos to make her the scapegoat, saying:

> Because MDOC, EMCF, and MTC wanted to hide the fact that their facility was not up to standards, administratively they all decided that it was Plaintiff's fault because they speculated she had ties to the Vice Lords . . . Notably, MDOC recommended that Plaintiff be not near the inmates because they had no other person to blame for the fact that there was absolutely not footage to help explain how the events went down.

[37] at 3, 29.

### B.      Sexual Harassment

Title VII prohibits sexual harassment in the workplace. *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 220 (5th Cir. 2023). To state a *prima facia* case for a Title VII sexual harassment/hostile work environment claim, the plaintiff must show that:

> (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action.

*Id.* at 221 (citing *Saketoo*, 31 F.4th at 1003). The defendant argues that the plaintiff cannot satisfy the fourth prong of the test.

A workplace is considered a hostile work environment when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Johnson v. Pride Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021). "Harassment is 'severe or pervasive enough' when (1) a reasonable person in the plaintiff's position would find it hostile or abusive, and (2) the plaintiff subjectively perceived the harassment as abusive." *Wallace*, 57 F.4th at 222. In determining the objective element of the test, the court "considers factors (each independently non-dispositive) such as: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Johnson*, 7 F.4th at 400).

### 1.      Objective Element

The defendant first argues that the plaintiff has not plead allegations severe or pervasive enough to satisfy the standard required by the Fifth Circuit in cases such as this one. Specifically, defendant states:

> **Jackson's claims, at best, exemplify "the ordinary tribulations of the workplace,"** which does not constitute actionable sexual harassment. Jackson

6

claims that Lee engaged in the following misconduct: (1) looked at Jackson and made a "dang" motion to suggest he found her attractive, (2) touched Jackson's hair and hand and then her leg on one occasion, (3) commented on Jackson's clothing, (4) stood in a manner that required Jackson to brush against him as she stood up from her chair on one occasion, and (5) propositioned Jackson for a threesome with Lee's wife. **If the allegations are true Lee's conduct would certainly qualify as boorish, immature, and unprofessional, but his conduct, particularly in light of the totality of the circumstances here, is not so pervasive and severe as to support Jackson's claim.**

[33] at 11-12. This Court does not agree. If the defendant's pared down version of the testimony was the extent of Jackson's allegations, perhaps they would not be sufficiently severe or pervasive. In "summarizing" the plaintiff's claims, however, MTC excluded necessary descriptors that contextualize the severity of the conduct alleged. The plaintiff has alleged much more than the sanitized version proffered by the defendant. For example, the plaintiff testified in her deposition that Lee "constantly" made remarks about her body and clothing, including saying to a coworker, "Oh, you see what she got on? You see them pants? See her ass in them jeans? Look her – look at her ass, and all that." [32-1] at 12, 17. Though, technically, this would be considered a "comment[] on Jackson's clothing," describing it as such is disingenuous. The same can be said for the other categories outlined by the defendant.

Early in her deposition, the plaintiff provides the following overview of the harassment she suffered at the hands of Lee:

He started touching on my hair. I would ask him to stop. He'll rub on my hair. I would ask him to stop touching me. He did that a few times, but – in front of people . . . [H]e used to come back there and act like he had to use the microwave in the office or he wanted some coffee out of there. But, like, he talking [sic] to Ms. Brown, and he would continue – like, try to touch my hand, and when he finally did get to the comfortable point of touching my hand, I kept telling him, Mr. Lee, leave me alone, and I will tell your wife.

And after the touching, **he kept making remarks toward my clothing**. I like them pants you got on. You look good in them pants. **Them some picnic – I have picnic** – and I would just tell him, you know, like, You need to quit saying stuff like that. And his wife, she – his wife was actually nice. She's a nice lady. And I used to tell him, you know, You need to – I'm fixing to tell your wife on you. You need to stop

that. What you doing? You need to leave me alone because I don't like you like that. You have a wife. You need to focus on your wife. And he'll say, I ain't worried about that.

And it finally got to the point where he said, My wife don't care. My wife like you, too. And so I was just, like, I don't care about your wife liking me, you know. And so he'll talk about – just randomly just bring up conversations about – at a previous job where him and his wife was talking to a female employee, but I kept telling him, That don't have nothing to do with me. Can you just leave out of my office? But because I shared the office with other case managers, I couldn't just, Hey, I need him out of here, because he used to make like he was coming in there to see the other case managers and not me, but I was the only one being uncomfortable. **So I used to leave my office, and I'll go back to my old office just to get away from him, and I'll sit in there and try to do my work.**

[32-1] at 8-9. The defendant may consider these instances "ordinary tribulations of the workplace," but this Court certainly does not. In this Court's view, the above testimony alone is sufficient to establish genuine fact issues regarding whether the plaintiff suffered "severe or pervasive" harassment. The conduct she describes throughout her complaint and deposition meets the criteria outlined by the Fifth Circuit because it was: (1) frequent, as she describes the conduct occurring constantly over several months; (2) humiliating, as several alleged instances of sexual comments occurred in front of coworkers; and (3) interfered with work performance, as she testified that she would go sit in her old office just to get work done. But this excerpt is not the extent of Jackson's allegations. The plaintiff has alleged more than just the conduct above, especially in her response to the motion.

Jackson's response added considerable detail to the conduct alleged in her complaint and her EEOC charge. The defendant argues that the added information should be disregarded under the sham affidavit doctrine, which "prevents a party who has been deposed from introducing an affidavit that contradicts that person's deposition testimony without explanation." *Free v. Wal-Mart La., Inc.*, 815 F. App'x 765, 766 (5th Cir. 2020). Not all inconsistent affidavits are

8

disregarded, however, if they "explain certain aspects of [a party's] deposition testimony" and "supplement, rather than contradict." *Id.*

Specifically, MTC casts aspersions on the plaintiff's response, saying:

Jackson's Response contains additional apparent statements of fact, such as Lee frequently commenting about Jackson's body and clothes and telling her that she made him "want to picnic." MTC does not find any such reference in Jackson's deposition or Affidavit and believes Jackson has inadvertently conflated facts from another action with this one in her Response.

[40] at 10 n.5. Though MTC could not find any such reference in the plaintiff's deposition, this Court located them quite easily.

First, as to the suggestion that the plaintiff "conflated facts from another action," the defendant offers no explanation of what action they are referencing, and the plaintiff's testimony in her deposition directly contradicts this proposition:

Q.   Okay. Have you ever been in a lawsuit like this where you've sued somebody?

A.   No, sir.

Q.   Has anybody ever sued you?

A.   No, sir.

Q.   I know you filed a charge for discrimination with the EEOC in relation to this case. Have you ever done that for anybody else?

**A.   No, sir, I haven't ever.**

[32-1] at 3. Beyond those covered in the above exchange, this Court is unsure what other action the defendant could be referencing and is unpersuaded and unimpressed by the defendant's inclusion of such an accusation without context or factual allegations, especially given the plaintiff's deposition testimony.

Second, the defendant lists "additional apparent statements of fact" that MTC did not find referenced in Jackson's deposition – frequent comments about Jackson's body and clothes and Lee

stating that Jackson "made him 'want to picnic.'" Though MTC could not find such references, they were easily found by this Court throughout the deposition.

> He started touching on my hair. I would ask him to stop. He'll rub on my hair. I would ask him to stop touching me. He did that a few times . . . But, like, he talking [sic] to Ms. Brown, and he would continue – like, try to touch my hand, and when he finally did get to the comfortable point of touching my hand, I kept telling him, Mr. Lee, leave me alone, and I will tell your wife.
>
> And after the touching, **he kept making remarks toward my clothing**. I like them pants you got on. You look good in them pants. **Them some picnic** – **I have picnic** – and I would just tell him, you know, like, You need to quit saying stuff like that.

[32-1] at 8-9. The plaintiff goes beyond this more general description of Lee's unwelcome advances and describes specific instances where he made remarks about her body and clothing. The plaintiff recounts one incident that occurred in front of a coworker:

> Q.   Yeah, I want to know –
>
> A.   But –
>
> Q.   – what he said. If it – if it includes –
>
> A.   Okay.
>
> Q.   – profanity, it's fine.
>
> A.   Oh, okay. But I ain't worried about it. I can get pussy. Shit, me and my wife – hell, we fuck other females on the daily. Shit, you ain't the first female we came that – shit. I can get pussy elsewhere. You ain't got to worry about it. You – I ain't gonna keep taking no rejection. Just out of anger of me not, you know, going with his request.
>
> Q.   He would say those kind of things directly to you or to other people?
>
> A.   Yeah, he would say it to me. Like, he wouldn't just sit up there – he was a showboat, but the only people he tried to showboat around was Lieutenant Grady. So Lieutenant Grady seen a lot of stuff that Lee was saying inappropriate to me, too, because he used to be walking with him.
>
> Q.   And did you say Gray or Grady?
>
> A.   Grady. He's a light-skinned guy. He's kind of heavy-set. He walked with him one day he was making inappropriate remarks about, **Oh, you see what she got on? You see them pants? See her ass in them jeans? Look her – look at her ass, and all that.** He was walking with him, and he – he heard a few of the remarks he had said.

10

[32-1] at 12. Jackson describes another instance that occurred in front of her toddler:

> Q. Okay. Is there any other – we didn't really cover – so let's – let me ask you about that. So the day that you went to pick up your check, he – did I understand he came out to the parking lot and made some crude remarks to you like – about wanting to have sex with you?
>
> A. Yeah, but he was already out there. A guy was being released that day, so him and a couple more officers were already outside . . . And he walked up, and he got to talking about having sex with me. Oh, I can say what I need to say now. **You don't work here no more. I can – I can keep saying it now. What you gonna do about it now? Let me and my wife go ahead and turn you out.** And Ms. Wells was, like, Get on back. You need to get on back, Lee, and stop all that nonsense, saying all that stuff.
>
> And then I was letting the window up, the back window, because it was down because she asked to see my youngest son. So I was letting the back window up so I can try to close the door to keep my youngest son from hearing that nonsense.

[32-1] at 21. The plaintiff also describes Lee's remarks about her clothing and body as constant:

> Q. Do you know why Mr. Lee sort of singled you out or you were one of the people he tried to harass?
>
> A. No, sir, because – I don't know. I'm just – I don't know. Honestly, I don't know. It was kind of shocking to me, which it wasn't shock – I understand when women are attractive, a lot of guys' approach are not what they, you know, should be, but I don't ever really care about that. **But when you go to put your hands on me, constantly making derogatory remarks and stuff like that, then it becomes a problem.**

[32-1] at 17. Thus, the contrast between the plaintiff's response and her prior testimony is not nearly as stark as the defendant makes it out to be. Furthermore, Jackson's inclusion of additional information is likely due, at least in part, to the defendant's grossly understated summarization of her allegations. This Court is inclined to view the plaintiff's response and affidavit as more supplementary than contradictory, but it is not necessary to decide because, as previously stated,

11

the conduct alleged in the plaintiff's complaint and deposition are sufficient without the added details.[4] The plaintiff has, therefore, satisfied the objective element.

### 2. *Subjective Element*

The defendant argues that Jackson has not satisfied the subjective element because if she had actually been offended by Lee's conduct, she would have quit:

> First, while MTC expects Jackson to argue that Lee's conduct personally offended her (i.e., the "subjective" test), the facts do not support such a self-serving declaration. Most importantly, Jackson testified that had she not been fired, she would have stayed at MTC as a case manager. While she complains now that Lee sexually harassed her, a reasonable person who was offended by Lee's conduct would not have stayed in the situation Jackson admitted she would have willingly stayed in, which can only lead to one conclusion – namely that Jackson was not subjectively offended by Lee's purported conduct.

[33] at 10-11. This argument is remarkably insensitive and is blind to the realities of working-class America. Most individuals have families relying on them for support and, without an alternative source of income, do not have the luxury of leaving a job. They do, however, have the right to be free from harassment in the workplace, and these rights are not diminished simply because a person is not privileged enough to willingly forgo a paycheck. Such is the case here.[5] Jackson provided ample evidence that she subjectively considered the harassment hostile and abusive: she told Lee on many occasions that his conduct made her uncomfortable and repeatedly complained of the harassment to coworkers and supervisors. Furthermore, Jackson began taking her work into another office just to avoid Lee. The plaintiff has also satisfied the subjective element.

---

[4] While the Court has accepted the plaintiff's response, her brief includes citations to non-academic sources such as Pinterest and Urban Dictionary and contains unnecessarily crude language to describe body parts and sexual acts. These crude descriptors are not provided as part of a quotation, which would be justifiable, but are used throughout the brief as part of the plaintiff's argument. The Court cautions the plaintiff's attorney to exhibit greater respect for his audience in future filings.

[5] Though this concept is generally understood and does not require evidence, it is worth noting that the plaintiff explicitly stated in her affidavit that she "could not afford to leave [her] job without another lined up" and "continued to work at EMCF . . . to support [her] kids." [36-1] at 5.

Interpreting the facts in the light most favorable to the plaintiff, as required at the summary judgment stage, this Court concludes that genuine fact issues exist regarding whether Jackson suffered "severe or pervasive" harassment. The defendant's motion as to the plaintiff's sexual harassment claim must be denied.

### CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that the Motion for Summary Judgment filed by Defendant Management & Training Corporation [32] is **GRANTED** as to Jackson's retaliation claims and is **DENIED** as to Jackson's sexual harassment claims.

**SO ORDERED** this the 8th day of July, 2024.

/s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**

13